| | |
|---|---|
| UNITED STATES OF AMERICA | ) ) ) |
| v. | ) ) Case No.: 13-cr-10023-DPW |
| MICHAEL E. McLAUGHLIN, | ) ) ) |
| Defendant. | ) ) |

**MEMORANDUM IN SUPPORT OF CHELSEA HOUSING AUTHORITY AND CHELSEA CITYWIDE TENANT ASSOCIATION'S MOTION FOR RECOGNITION AS VICTIM AND APPLICATION FOR AWARD OF RESTITUTION**

The Chelsea Housing Authority ("CHA") and the Chelsea Citywide Tenants Association ("CCTA") hereby respectfully submit this memorandum in support of their motion for CHA to be recognized as a victim in this case, for CHA to make an in-court victim impact statement, and for CHA to receive restitution in the amount of $548,192.

**INTRODUCTION**

Organized in 1946, CHA is a public body corporate and politic duly organized and authorized by Mass. Gen. L. c.121B § 3. Funding for CHA is provided by the Commonwealth of Massachusetts and United States Department of Housing and Urban Development ("HUD"). CCTA is a project of the Chelsea Collaborative, Inc., a Massachusetts non-profit corporation, which advocates on behalf of tenants residing in Chelsea, Massachusetts, including but not limited to residents of CHA facilities.

CHA is charged with the administration of the low-income housing program and owns and operates approximately 1,450 units, including five developments serving families and three developments serving elderly and disabled residents. Chelsea is one of the most economically

depressed areas in Massachusetts, with a per capita income that places it as 349th out of the Commonwealth's 351 municipalities, according to the U.S. Census Bureau's 2010 Decennial Census Demographic Profile data. The vast majority of CHA tenants receive public assistance benefits or earn incomes at or near the federal poverty level. CHA residents are one of the most vulnerable groups in Massachusetts. CHA and ultimately the families it serves, including those represented by CCTA, were victimized by Michael E. McLaughlin when he falsely reported to the government his actual salary amount and underreported it by hundreds of thousands of dollars for his own personal gain.

During his tenure as executive director of CHA, Michael E. McLaughlin, including at least the years from 2007 through 2010, lied when he submitted the CHA budget to the regulatory authorities and falsified documents in order to prevent disclosure and disapproval of his inflated salary.

In fiscal year 2008, McLaughlin underreported his salary by $90,963 by falsely representing his salary as $161,945. In 2009, he was compensated $136,399 more than his budgeted annual salary. In both 2010 and 2011, when the salary reported to the government was $160,415, McLaughlin actually more than doubled his income by failing to report an additional $164,481 in funds which would not have been approved by the government if disclosed. The funds which McLaughlin lied about in order to continue to receive them were intended to benefit CHA for the low-income residents it serves.

CHA and CCTA pray that CHA be recognized as a victim of that crime before this Court, and seek restitution to CHA in the amount of the increased compensation taken by McLaughlin, $548,192.

The Crime Victims' Rights Act defines as "victims" those "directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e). There can be no doubt that CHA was directly and proximately harmed when McLaughlin falsified CHA's own budget documents for his personal gain. As a victim, CHA is permitted to give an in-court victim impact statement at the defendant's sentencing and to receive a restitution award for the monies diverted from CHA. Accordingly, this Court should permit recognition of CHA as victim of the defendant's crime, permit an in-court victim impact statement, and require the defendant to pay restitution.

## BACKGROUND

The following facts are reasonably believed to be true, based on the sources cited and, on information and belief, on law enforcement reports in the possession of the United States Attorney's Office:

1. Michael E. McLaughlin was hired as executive director of CHA in 2000 with a starting salary of $77,500. Rule 11 Hr'g Tr. 13:8, Feb. 19, 2013. [Dkt. No. 13]

2. Among the duties of the executive director is the preparation of CHA's annual budget for approval of the five-member Board of Commissioners of CHA ("Board").

3. The executive director's compensation is included in CHA's annual budget for consideration by the Board, and pursuant to state and federal regulatory guidance, the Board is advised by federal regulation to adopt an executive director compensation "within the range of that provided to comparable executive employees" and obligated by state regulation to adopt an executive director compensation within a prescribed state salary schedule range. U.S. Department of Housing and Urban Development Public and Indian Housing Handbook 7401.7, Section 2-1 (1987); 760 C.M.R. 4.05(1)(a).

3

4. Pursuant to requirements of U.S. Department of Housing and Urban Development ("HUD") and the Massachusetts Department of Housing and Community Development ("DHCD"), upon approval of the annual budget by the Board, the executive director is responsible for submitting information from various portions of the budget for agency review. *Id.*; *see also* Affidavit of Lizbeth A. Heyer, attached hereto at Exhibit A.

5. At a time unknown to CHA, Michael E. McLaughlin began to falsify the stated amount of executive director compensation in his electronic submission of the CHA budgets submitted to DHCD.

6. Due to McLaughlin's misreporting, neither HUD nor DHCD were aware of the financial discrepancies or the actual amount of McLaughlin's income.

7. If the true amounts of McLaughlin's salary had been included in the budget, CHA's budget would have been rejected due to the impermissibly high salary, CHA's finances and operations would have been investigated, and McLaughlin's salary would not have been permitted to continue to exceed the guidelines in successive years. Heyer Aff. ¶ 18.

8. Upon information and belief, as of 2005, McLaughlin had obtained approximately $40,000 of "hidden income" and joked to state auditing officials that, "all my neighbors are rich and I have to keep up with them." Andrea Estes and Sean P. Murphy, "Auditors noted, then ignored, McLaughlin pay; AG investigating repeated failure to act on an outrage that was right in plain view," *Boston Globe*, Feb. 20, 2012.

9. McLaughlin has pled guilty to submitting falsified salary information from the CHA budgets for fiscal years 2008-2011, resulting in unreported executive director compensation enhancements totaling $548,192. Information [Dkt. No. 1].

10. During the time that McLaughlin was enhancing his own salary, the CHA budgets for maintenance to, and improvement of, its facilities and services to residents were limited, and needed upgrades and repairs were foregone due to financial constraints, which negatively impacted the living conditions of CHA's residents. *See*, *e.g.,* CHA Resident / CCTA Member Statements, attached hereto at Exhibit B.

11. Upon the uncovering of this scheme in October 2011, McLaughlin is reported to have told the *Boston Globe* that, "'the rebel in [him]' made him think that if [the government] wanted to know his full salary, they could find it on their own." Andrea Estes and Sean P. Murphy, "Chelsea housing chief's pay draws fire; Defends $360,383 salary, but hid true sum," *Boston Globe*, Oct. 30, 2011.

12. On November 3, 2011, McLaughlin resigned as executive director, followed shortly by all of the members of the CHA Board. As a result, on November 21, 2011, the Attorney General of the Commonwealth sought, and Massachusetts Supreme Judicial Court Associate Justice Robert Cordy approved, the appointment of a Temporary Receiver for the CHA. Since that time, the Board has been reconstituted, and is comprised entirely of new members. *Department of Housing and Community Development v. Chelsea Housing Authority*, No. SJ-2011-0500, Final Report of Receiver, attached hereto at Exhibit C.

13. McLaughlin's falsification of the records concerning the use of more than $500,000 in order to provide himself with additional compensation has substantially harmed CHA by depriving it of that much-needed revenue.

14. The low-income residents of CHA are an extremely vulnerable population. Both federal and state budget allocations for public housing are scarce, and McLaughlin's actions directly reduced the amounts of funds available for CHA's legitimate purposes.

15. McLaughlin's pattern of felonious deceit has not only deprived CHA of more than $500,000 which had been intended for the benefit of the population it serves, including the low-income, elderly, and disabled residents, but his actions have also jeopardized millions of dollars in federal funding which are the primary source of support for CHA, as noted by the ongoing HUD investigation of CHA:

    "Our office has concluded that [McLaughlin administration of] the Chelsea Housing Authority violated the construct of the Capital Fund Program by accepting the subject funds under one pretense and by using it for another… The [McLaughlin administration of the] CHA violated the public trust by its representations to HUD, the residents and tenants of the Federal Low Rent Public Housing developments in Chelsea and the public at large for the following grants: [totaling $7,005,981.48]."

    (Letter of Marilyn B. O'Sullivan, Director, Office of Public Housing to CHA Executive Director Albert Ewing, Dec. 27, 2012), attached hereto at Exhibit D.

16. McLaughlin's misrepresentations have severely damaged the CHA's reputation, have done significant harm to its tenants, including those represented by CCTA, have pushed CHA into state receivership, and have jeopardized the financial stability of the entire agency, all for the sake of McLaughlin's own personal financial gain.

## ARGUMENT

**I. The CVRA Provides CHA With an Opportunity To Be Heard.**

The Crime Victims' Rights Act, codified at 18 U.S.C. § 3771(e) states, in pertinent part:

"For the purposes of this chapter, the term 'crime victim' means a person directly and proximately harmed as a result of the commission of a Federal offense."

6

The statute "was designed to be a 'broad and encompassing' statutory victims' bill of rights." *United States v. Degenhardt*, 405 F.Supp.2d 1341 (D. Utah 2005) (quoting 150 Cong. REC. 54261 (daily ed. Apr. 22, 2004) (statement of Sen. Feinstein). The source statutes for the CVRA are the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663 and the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A et seq., each define "victim" as:

> "[A] person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663(a)(2); 18 U.S.C. § 3663A(a)(2); *see generally* Wright and Welling, 3 Fed. Prac. & Proc. Crim. § 546 Restitution (4th ed.).

The CVRA sought to make victims "independent participants in the criminal justice process." *Kenna v. U.S. Dist. Court for C.D. Cal.,* 435 F.3d 1011, 1013 (9th Cir. 2006). Because of its nature as a remedial statute, courts should, "interpret the provisions of this Act liberally to facilitate and accomplish its purposes and intent." *Elliott Industries Ltd. Partnership v. BP America Production Co.*, 407 F.3d 1091, 1118 (10th Cir. 2005); *see also United States v. Ekanem*, 383 F.3d 40 (2d Cir. 2004) (term "person" in restitution statutes is not limited to natural persons). The First Circuit has recognized the ability of governmental entities, such as housing authorities, to be considered victims. *United States v. Newell*, 658 F.3d 1, 30 (1st Cir. 2011) ("governmental agencies may, 'without dispute,' be considered victims") (quoting *United States v. Janosko*, 642 F.3d 40, 41 (1st Cir. 2011).

Not only must the CVRA as a whole be interpreted liberally, but its definition of "victim" requires a generous construction. CVRA co-sponsor John Kyl stated that "[t]his is an intentionally broad definition because all victims of crime deserve to have their rights protected,

whether or not they are the victim of the count charged." 150 CONG. REC. S10912 (Oct. 9, 2004). The description of the victim definition as "intentionally broad" was found by the *Kenna* case to reflect the consensus view of the Senate. *Kenna*, 435 F.3d at 1015-16.

Courts have also held that a movant need not be named in the indictment in order to be deemed a crime victim under the CVRA. *In re Stewart*, 552 F.3d 1285, 1289 (11th Cir. 2008) ("The CVRA, however, does not limit the class of crime victims to those whose identity constitutes an element of the offense or who happen to be identified in the charging document."). In determining who is a crime victim, the statute "instructs the district court to look at the offense itself only to determine the harmful effects the offense has on parties." *Id.* In *In re Stewart*, the defendant was charged with fraud in which the employee charged mortgage loan customers a higher loan origination fee than was the bank's practice. The extra fees were pocketed by the employee. The fraud alleged in the indictment was perpetrated against the bank, because the additional fees, when collected, rightfully belonged to the bank and not the employee. The Eleventh Circuit ruled that the customers were crime victims, even though it was not illegal for the bank to charge the higher fees.

Similarly here, Defendant is charged with a pattern of violations of 18 U.S.C. § 1519, submitting false information about his salary so that he could pocket the amounts that were not properly disclosed. Although the indictment specifically references the obstruction of the administration of the federal program, the true harm is the reduction in funding that affected the CHA. *United States v. Hoover*, 175 F.3d 564, 566-69 (7th Cir. 1999) (university was recognized as MVRA victim of false statement offense under 18 U.S.C. § 1001, where it provided tuition loan money under federal student loan program based on defendant's misrepresentations in loan application). But for the commission of McLaughlin's federal crime, CHA would have had the

8

14443483.1

full benefit of the funds which Defendant concealed. Thus, the federal offense has directly and proximately resulted in CHA's harm.

Additionally, this Court is not bound by the government's definition of victim, and therefore CHA's right to restitution is not affected by the government's inclusion or omission of CHA on any list of victims in any Fed. R. Crim. P. 32(c)(1)(B) submission. *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917 (9th Cir. 2001) (affirming order of restitution under the MVRA, and holding that district court properly permitted non-party victim to present argument even though the victim had not been identified by the government or in the presentence report).

**II. McLaughlin's Crime Was Direct and Proximate Cause of CHA's Loss of $548,192.**

McLaughlin has pled guilty to falsification of records in violation of 18 U.S.C. § 1519. Under the CVRA, CHA is a victim of this crime, as it was "directly and proximately harmed" by him. 18 U.S.C. § 3771(e) (emphasis added). The statute must be interpreted consistent with its plain language. *See United States v. Serawop*, 505 F.3d 1112, 1122 (10th Cir. 2007).

To be considered a "crime victim" under the CVRA, a movant must show that the offense was both a direct (i.e., "but for") cause and a proximate (i.e., "foreseeable") cause of the harm. *United States v. Sharp*, 463 F. Supp. 2d 556, 565 (E.D. Va. 2006) ("[f]oreseeability is at the heart of proximate harm; the closer the relationship between the actions of the defendant and the harm sustained, the more likely that proximate harm exists.") (citing *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 713 (O'Connor, J. concurring) ("Proximate causation is not a concept susceptible of precise definition…. We have recently said that proximate causation 'normally eliminates the bizarre'… and have noted its 'functionally equivalent' alternative characterizations in terms of foreseeability…and duty…Proximate causation depends to a great extent on considerations of the fairness of imposing liability for

9

remote consequences." (internal citations omitted))). As is the case in virtually all other types of causation inquiries, the question of whether a federal offense caused direct and proximate harm to the movant for purposes of the CVRA requires a fact-specific analysis.

Throughout the budget process of the CHA from 2007 through 2010, CHA relied on truthful statements of its executive director to allocate its funding and set its salaries through its budgeting process. Fact No. 2, *supra*. In the course of determining its yearly budget, McLaughlin drafted and sought Board approval for amounts to be expended. Fact No. 4, *supra*.

HUD guidance and sound administrative practice called for housing authorities such as CHA to set executive compensation, particularly for executive directors, at a level within the range of that provided to comparable executive employees. U.S. Department of Housing and Urban Development, Public and Indian Housing Handbook 7401.7, Section 2-1 (1987).

Pursuant to Massachusetts regulation, CHA was obligated to report information concerning its salary budget to the DHCD for review and approval:

> (1) In approving salaries and wages in a [Local Housing Authority ("LHA")]'s budget, the Department shall determine that all of the following conditions have been met:
>   a) In selecting its employees the LHA has followed all applicable hiring procedures (in the case of the executive director, the Department's "Executive Director Hiring Guidelines") which shall have been approved by the Department and has complied with the LHA's personnel policy and any other applicable legal requisites.

760 C.M.R. 4.05(1)(a). In July 2007, DCHD published Public Housing Notice 2007-06, "Executive Director Salary and Qualification Schedule" which established the base salary for housing authority executive directors, pursuant to which the highest base salary for an executive director within the guidelines was $98,864; McLaughlin's $242,908 grossly exceeded the permissible range. Heyer Aff. ¶ 13.

10

McLaughlin did not report his true salary, and was paid with monies that would have otherwise served the pressing needs of the CHA. Fact No. 5, *supra*. While McLaughlin was enhancing his own salary, the CHA facilities and CCTA members were suffering from the negative effects of deferred capital improvements and maintenance expenditures, including but not limited to inadequate pest control. Fact No. 10, *supra*. The cumulative effect of the loss of more than half a million dollars has a meaningful impact on CHA's finances and its ability to carry out its duties to its residents. Fact No. 13, *supra*.

Because the loss of funds was a direct and foreseeable result of McLaughlin's falsification, McLaughlin's actions necessitate CHA's recognition as victim of his crime.

### III. CHA Is Entitled to Restitution for Funds Taken by McLaughlin.

The court should also award restitution for the financial damage caused by the Defendant. Under the CVRA, a victim has "[t]he right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6). Under the VWPA, 18 U.S.C. § 3663 (c) (1), "This section shall apply in all sentencing proceedings for convictions of, or plea agreements relating to charges for any offense committed by fraud or deceit." Further, the MVRA, 18 U.S.C. § 3663A *et seq.* states, in relevant part: "(b) The order of restitution shall require that such defendant: (1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense (A) return the property to the owner of the property or someone designated by the owner."

Under 18 U.S.C. § 3663A, full restitution is mandatory when an identifiable victim has suffered pecuniary loss and the defendant is convicted of "an offense against property" under Title 18, including "an offense committed by fraud or deceit." Deceit against government funding is an offense against property. 18 U.S.C. § 641. The term "including any offense committed by fraud or deceit" modifies "offense against property." McLaughlin committed an

offense of deceit in falsifying government records, and such deceit was made against government property in the form of its grants from HUD, and as such the MVRA applies. *United States v. Gee*, 432 F.3d 713, 715 (7th Cir. 2005) (local organization that held contracts to administer federal welfare program was MVRA victim of conspiracy to defraud the United States through bribery concerning programs receiving federal funds; organization was a recipient of federal funds designated for a particular use).

The procedures to be followed in determining whether, and to what extent, to order restitution pursuant to the MVRA are set out in 18 U.S.C. § 3664. *See* § 3663A(d). Section 3664 provides that "[i]n each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A); *see also United States v. Fair*, 699 F.3d 509 (D.C. Cir. 2012).

In the plea agreement, McLaughlin admitted that hundreds of thousands of dollars were concealed as a result of his actions and were used not for any legitimate purposes of CHA, but instead to compensate him unauthorized amounts. Plea Agreement ¶ 1 [Dkt. No. 6]. As those funds were removed from availability for the proper use of CHA, CHA is entitled to restitution for the full amount of that loss, here $548,192. *Compare United States v. Cornier-Ortiz*, 361 F.3d 29, 42 (1st Cir. 2004) (rejecting restitution when misapplication of federal grant funds were still employed in the service of the purpose of the grant).

Moreover, Defendant's ability to pay is not a factor in determining the amount of restitution. Under 18 U.S.C. § 3664(f)(1)(A), "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *United States v. Harris*, 302 F.3d 72, 75 (2d Cir.

12

2002) ("[T]he district court was required to order restitution and determine the amount thereof without consideration of the economic circumstances of the defendant."); *United States v. Catoggio*, 326 F.3d 323, 326 (2d Cir. 2003).

The First Circuit has recently held that funds improperly transferred from a housing authority's accounts can be subject to restitution. *Newell*, 658 F.3d at 30. In *Newell*, the defendant former officials of a Native American tribe in Maine were sentenced by Judge Singal to pay tens of thousands of dollars in restitution after being convicted, *inter alia*, of making false statements related to their misapplication of the funds granted to the Passamaquoddy Tribe Indian Township Housing Authority. *Id.* at 33. Here, McLaughlin's actions in similarly concealing hundreds of thousands of dollars in housing authority funds should also be subject to a restitution award.

### IV. Alternatively, this Court Should Exercise its Discretion to Hear from CHA.

Should this court hold that CHA is not a victim for purposes of the CVRA, it nevertheless should allow CHA to appear at the sentencing. Even if a movant does not meet the statutory definition of "crime victim," nothing in the CVRA prohibits a court from providing that movant with participatory opportunities.[1] *See United States v. Turner*, 367 F. Supp. 2d 319, 327 (E.D.N.Y. 2005). The *Turner* court suggested that to safeguard the rights set forth in § 3771 the court should, absent an affirmative reason to think otherwise, presume that a person whom the government asserts was harmed was in fact harmed, and treat that person as a victim for purposes of the CVRA. *Id*. ("[A]bsent an affirmative reason to think otherwise, I will presume that any person whom the government asserts was harmed by conduct attributed to a defendant,

---

[1] CHA prays that this Court permit the brief statements of three CHA residents, who are also members of the CCTA, to be delivered on behalf of CHA, for an aggregate of approximately 15 minutes, at the time of sentencing.

13

as well as any person who self-identifies as such, enjoys all of the procedural and substantive rights set forth in § 3771.").

Numerous cases have held that the decision to let a crime victim be heard in the case is not unfairly prejudicial or error, either in the absence of a specific finding on crime victim status or if the movant does not qualify for official victim status. *United States v. Greig,* No. 12-1752, slip op. at 22-23 (1st Cir. May 17, 2013); *United States v. Duffy*, 315 Fed. Appx. 216 (11th Cir. 2009); *United States v. Poole*, 241 Fed. Appx. 153 (4th Cir. 2007).

Moreover, for purposes of sentencing, federal courts have long possessed broad authority to review a wide range of information relevant to the background, character and conduct of a defendant in order to determine a sentence. At common law, "a sentencing judge has long been authorized to 'conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.'" *United States v. Serhant*, 740 F.2d 548, 552 (7th Cir. 1984) (quoting *Roberts v. United States*, 445 U.S. 552, 556 (1980)). This common law understanding was codified by statute in 18 U.S.C. §3577, later renumbered §3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. §3661.

In this case, CHA has experienced substantial economic, reputational, and institutional harm as a result of McLaughlin's deceitful falsification of documents, and should therefore be afforded an opportunity to be heard concerning the impact of this crime at the time of sentencing.

## CONCLUSION

WHEREFORE, the Chelsea Housing Authority and the Chelsea Citywide Tenants Association respectfully request that this Court: (1) recognize CHA as a victim of the defendant's offense pursuant to the CVRA, or alternatively, pursuant to this Court's discretion; (2) allow CHA to make an in-court victim impact statement at the defendant's sentencing pursuant to the CVRA, or alternatively, pursuant to this Court's discretion; and (3) award CHA restitution in the amount of $548,192.

Respectfully submitted,

| CHELSEA HOUSING AUTHORITY, | CHELSEA CITYWIDE TENANTS ASSOCIATION, |
|---|---|
| By its Attorneys, | By its Attorney, |
| /s/ J. William Codinha | /s/ Jay Rose |
| J. William Codinha (BBO # 087740) | Jay Rose (BBO # 550924) |
| Cornelius J. Moynihan, Jr. (BBO #358840) | GREATER BOSTON LEGAL SERVICES |
| Ronaldo Rauseo-Ricupero (BBO #670014) | 197 Friend Street |
| NIXON PEABODY LLP | Boston, Massachusetts 02114 |
| 100 Summer Street | Tel: (617) 603-1651 |
| Boston, Massachusetts 02110 | Fax: (617) 371-1222 |
| Tel: (617) 345-1000 | jrose@gbls.org |
| Fax: (617) 345-1300 | |
| jcodinha@nixonpeabody.com | |

Dated: May 31, 2013

## CERTIFICATE OF SERVICE

I, J. William Codinha, do hereby certify that this document, filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered participants on this date.

/s/ J. William Codinha
J. William Codinha

14443483.1